**Donald F. KRANE, Cynthia Gay, Michael H. Jones, Bruce M. Wilson and Eric B. Winfrey, Plaintiffs,**

v.

**CAPITAL ONE SERVICES, INC., Defendant.**

**No. CIV.A. 3:03cv675.**

United States District Court, E.D. Virginia, Richmond Division.

April 20, 2004.

---

John B. Donohue, Craig J. Curwood, Thosen & Scher LLP, Richmond, VA, for Plaintiffs.

W. Carter Younger, Carl E. Omohundro, Jr., McGuire Woods LLP, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

On November 21, 2004, the Plaintiffs, Donald F. Krane, Cynthia Gay, Michael H.

Jones, Bruce M. Wilson, and Eric B. Winfrey, filed the First Amended Complaint ("FAC"), alleging five counts against the Defendant, Capital One Services, Inc. ("Capital One"). Counts One and Two allege that Capital One's termination of the Plaintiffs' employment constituted disparate treatment and disparate impact discrimination, respectively, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Count Three alleges violations of the Older Workers Benefit Protection Act ("OWBPA") amendments to the ADEA, 29 U.S.C. § 626(f), and of the ADEA itself, arising out of Capital One's attempts to obtain waivers of ADEA claims from the Plaintiffs. Count Four asserts that Capital One violated the OWBPA by failing to provide in its waiver forms certain information that was required by law. Finally, Count Five alleges unlawful retaliation, in violation of the ADEA. The Plaintiffs seek a declaration that the Defendant's conduct violated the ADEA and OWBPA, injunctive relief against further similar conduct, restoration of class members to their previous positions or front pay, back pay up to the date of their reinstatement, compensatory damages, and costs. The FAC purports to present a representative, or class, action under 29 U.S.C. § 216(b).

Pursuant to Fed.R.Civ.P. 12(b)(6), Capital One has moved: (1) for dismissal of Counts One, Three, Four, and Five, in their entirety; (2) for dismissal of all claims by Plaintiffs Gay, Jones, and Wilson as barred by the statute of limitations; (3) for dismissal of the claims of Plaintiff Krane because he has not timely opted into this action; and (4) for dismissal, as untimely, of any class claims arising from events that occurred before October 11, 2002. For the reasons set forth below, the motion is granted in part and denied in part.

## STATEMENT OF THE FACTS

As is necessary, the facts are stated as asserted in the FAC, affording the Plaintiffs all reasonable inferences.

Capital One is a Delaware corporation, doing business in Virginia. The Plaintiffs are former employees of the Richmond, Virginia office of Capital One who are all over the age of forty now and were forty years old or older at the time their employment with Capital One was terminated. Krane was hired by Capital One around May 1998 to serve as a Tier 8 employee,[1] and he was terminated in December 2001, at the age of sixty-two. FAC ¶¶ 8, 32. Gay was employed by Capital One as a Tier 7 employee from about June 1999 until November 26, 2001, when she was forty-seven. *Id.* ¶ 9. Jones was hired as a Tier 5 employee around August 2000, and he was terminated on December 14, 2001, at the age of forty-one. *Id.* ¶ 10. Wilson was employed as a Tier 5 employee from July 19, 2000 until his termination on March 29, 2002, when he was forty-three. *Id.* ¶ 11. Winfrey, a Tier 6 employee, was hired in February 1999 and was terminated on October, 25, 2002, at the age of forty. *Id.* ¶ 12.

Pursuant to 29 U.S.C. § 626(b), the Plaintiffs purport to represent a class of

---

1. Capital One organizes its employees into tiers based on their job responsibilities. Tiers 1, 2, 3, and 4 are composed mostly of senior management; Tiers 5, 6, and 7 are middle management. FAC ¶ 32. Tier 8 includes non-management hourly employees. *Id.* Capital One asserts that only Tiers 5, 6, 7, and possibly 8 were subject to the reorganization program at issue in this action.

In the FAC, the Plaintiffs state that the reorganization was applied "across [the] entire workforce, at all tier levels and in exempt and non-exempt workforces." *Id.* ¶ 85. At the Initial Pretrial Conference with the Court, however, Plaintiffs' counsel stated that he was not alleging that high level managers were subject to the reorganization.

similarly situated former employees who were terminated from employment by Capital One between October 2001 and the present pursuant to a common policy of age discrimination. The FAC defines the class to include:

> all persons age 40 or older who were employed by Capital One and whose demotion, discharge or other forced separation from Capital One during the period from about October 1, 2001 through the present, and continuing, resulted from Capital One's policy requiring that 6% to 10% of Capital One's workforce be "managed out" by categorizing or characterizing their performance as unacceptable.

*Id.* ¶ 14. In addition, Plaintiffs Gay, Jones, Wilson, and Winfrey purport to bring claims on behalf of a subclass composed of those former Capital One employees who executed waivers of ADEA claims at the time of their terminations. The subclass is defined to include:

> all persons age 40 or older who were employed by Capital One, were discharged during the period from about October 1, 2001 through the present and continuing, and were offered "Separation Pay" conditioned upon signing a Letter of Agreement including a release and waiver of age discrimination claims that (1) did not include 45 days to consider the release and waiver; (2) did not include the ages and job titles of all persons terminated by Capital One and retained by Capital One as part of the termination program; and (3) included

provisions requiring the return of any separation pay provided and threatened actions for attorney fees if the person filed an action for age discrimination. *Id.* ¶ 15.

According to the Plaintiffs, Capital One engaged in a policy of aggressive growth from 1995 through 2001, during which time it hired employees who would be "the best industry candidates for employment." *Id.* ¶¶ 27–28. In this campaign, Capital One touted its youthful culture[2] and its high number of young employees, in an attempt to recruit even more young employees. *Id.* ¶¶ 36–38. The average age of Capital One employees at the time was twenty-six to twenty-nine years old. *Id.* ¶¶ 36, 38. The Plaintiffs also state that younger employees were more often selected for advancement within the company than older employees. *Id.* ¶¶ 48–56 ("On information and belief, Plaintiffs allege that, in the 'Talent Forecasting' and other processes used to identify 'high potential' employees, age was either considered a negative factor and that these procedures relied on such subjective factors that older employees were negatively and adversely impacted by the selection process and were not generally included on the 'high potential' lists."). The evaluation and promotion policies of Capital One were developed by the Benefits Committee, which is composed of "the highest tier employees of the company." *Id.* ¶¶ 59–62.

Beginning in the middle of 2001, Capital One embarked on a new endeavor to cut costs and increase profits.[3] *Id.* ¶ 65. To

---

2. The Plaintiffs state that Capital One's orientation and community-building activities were targeted to younger employees. These included obstacle courses, physical challenges, "alcohol consumption, laser light displays, extremely loud music of young artists, laser tag games, outings to amusement parks, snowboarding activities, and extreme sports displays such as in-line skates, skateboards and BMX bikes." FAC ¶¶ 39, 44. According to

the Plaintiffs, Capital One's youthful culture also regrettably included a tolerance for demeaning comments about older employees. *Id.* ¶¶ 39–43.

3. The Plaintiffs also dispute the very necessity of the reorganization. The Plaintiffs state that Capital One was experiencing growth at the time the reorganization was begun and that it continued to hire employees—most of

those ends, Capital One adopted the so-called "Capital One Workout," or, as it was later called, "Worksmart." [4] *Id.* ¶ 76. According to the Plaintiffs, underlying the streamlining and reorganization process was the idea that "savings to the company resulting from the mass terminations of employees would increase with the percentage of older employees among the terminated." *Id.* ¶ 81. The Plaintiffs claim that senior management at Capital One set a goal of eliminating six to ten percent of Tier 5–7 employees between the summer of 2001 and the first quarter of 2002. *Id.* ¶¶ 86, 93. The reorganization mechanism that senior management imposed is explained in the FAC as follows: "[t]he company set out to label 10–12% of the tier 5–7 workforce as 'Below' or 'Approaching' performance expectations, from which no less than the mandated 6% would be 'managed out' and their employment terminated." *Id.* ¶ 87. Middle managers (most of them under forty years of age) were in charge of evaluating employees under management's policy, but the Plaintiffs claim that Capital One had already developed a list of employees (including a disproportionately high number of older employees) scheduled for termination before evaluations had even begun. *Id.* ¶ 89. The Plaintiffs also state that senior management expected that six to ten percent of the Tier 4 and 8 employees would be terminated, although specific goals or policies were not established as to them. *Id.* ¶ 88. New hires and those newly promoted were exempted from the reorganization program. *Id.* ¶¶ 114–15.

Because employees were to be terminated ostensibly on the basis of performance, Capital One middle managers had to begin evaluating as substandard employees, like

them younger—throughout the reorganization process. FAC ¶¶ 137–39.

4. The Plaintiffs state that the Defendant's reorganization plan was based on a model de-

the Plaintiffs, who had previously received satisfactory reviews. *Id.* ¶¶ 91–92. The newly imposed evaluation policy was a very subjective one—unlike the previously objective review strategy that had been used before the reorganization. *Id.* ¶¶ 97–100. Senior management allegedly told middle managers that age should be a negative factor in evaluating employees. *Id.* ¶ 103. In addition, the Plaintiffs state that the generally young middle managers injected their own age biases into the already-subjective evaluations process. *Id.* ¶ 124. While middle managers reviewed employees, the Plaintiffs state that senior managers kept records of and somehow generally approved the evaluations made at lower management levels. *Id.* ¶¶ 117–18.

The abbreviated time table of the reorganization meant that many employees were terminated before they were given an effective chance to improve shortcomings identified during their performance evaluations. *Id.* ¶¶ 94–112. Consequently, "termination was inevitable" when an employee was initially evaluated as substandard. *Id.* ¶ 117. The Plaintiffs' purported class also includes former Capital One employees aged forty or older who resigned in the face of allegations of poor performance and of inevitable termination; the Plaintiffs claim these class members were constructively terminated. *Id.* ¶ 130. The Plaintiffs allege that their positions at Capital One were assumed by younger employees after their termination. *Id.* ¶¶ 138–39.

Although Capital One's basic reorganization policy is claimed to have been implemented in the middle of 2001 and continued until the beginning of 2002, the

veloped by General Electric Corporation, which was subsequently challenged in litigation similar to the litigation here. FAC ¶¶ 68–76.

Plaintiffs also aver that "terminations of varying percentages have continued every quarter up to the present, and are continuing forward." *Id.* ¶ 135. The Plaintiffs state that Capital One has increased its goals for workforce reduction to ten to twelve percent of all employees. *Id.* In addition, they claim continuing injury by virtue of their terminations because Capital One has labeled employees terminated for substandard performance as " 'not eligible for rehire,' " which has hurt the Plaintiffs' chances of finding employment, either with Capital One or with another company. *Id.* ¶ 136.

The Plaintiffs plead that a significant component of Capital One's unlawful termination program was the ADEA claim waiver contained in the Letter of Agreement ("LOA") that Capital One required terminated employees to execute. *Id.* ¶¶ 141–46. The LOA promises employees additional compensation if they waive claims against Capital One, including any legal claims under the ADEA. Specifically, the LOA provides:

*Waiver of ADEA Rights and Claims/Opportunity for Review.* You understand that this agreement specifically releases and waives all rights and claims you may have under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq; provided, however, that any rights or claims under the ADEA which may arise after the date this Agreement is executed are not waived by this Agreement. You agree and acknowledge that your execution of this Agreement is completely voluntary and that you have been advised to consult with an attorney prior to executing this Agreement to ensure that you fully and thoroughly understand its legal significance. You acknowledge you have at least twenty-one days from receipt of this Agreement to consider its provisions, during which time you can consult with counsel concerning its terms.

Capital On Services, Inc.'s Memorandum of Law in Support of Partial Motion to Dismiss and Motion to Limit Rearward Scope of Plaintiffs' Proposed Class Definitions [hereinafter "Capital One's Opening Brief at ____"], Ex. 6, LOA at 5–6. The LOA also contains a so-called "tender back" provision, which reads as follows:

[y]ou understand and agree that any action by you in violation of this Agreement shall void Capital One's obligations to you for all payments and benefits provided for under this Agreement, shall require that you immediately forfeit all amounts paid to you by Capital One under this Agreement, and shall further require you to pay all reasonable costs and attorneys' fees incurred by Capital One in defending any action brought by you in violation of this Agreement or brought by Capital One to enforce this Agreement, in addition to any other damages or relief to which Capital One may be entitled.

*Id.* at 2–3.

The foregoing facts comprise the factual backdrop for the five counts in the FAC. Count One claims that Capital One's reorganization program violated the ADEA by disparately treating older employees. The FAC points to the following unlawful acts:

a. age was a motivating factor and/or made a difference in the decision(s) to terminate, discharge or constructively discharge Plaintiffs and similarly situated individuals;

b. the scheme or plan disparately treated class members through their separation from employment by termination, discharge or constructive discharge, without offer of other employment for job positions for which they were qualified and/or through class members' replacements by younger, less qualified persons; and

c. the scheme or plan excluded class members from consideration for employment positions when equally effective means to achieve any legitimate employment goals were available with lesser disparate impact on class members;

d. the scheme or plan included defendant's attempt to secure age discrimination waivers and releases through illegal means which included the failure to provide sufficient time to consider the waiver or release, the failure to provide information of job titles and ages of employees selected and not selected for termination, the inclusion of threats of legal action, damages, attorneys fees, injunctive relief if employees brought actions under the ADEA or sought monetary or other relief through [Equal Employment Opportunity Commission ("EEOC")] charges, and the inclusion of "tender back" provisions, which were declared improper and unenforceable in *Oubre v. Entergy Operations, Inc.*, [sic] 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998).

FAC ¶ 154. The Plaintiffs contend that poor performance was simply a pretextual reason for their terminations and that the true motivation was age bias. They state that Capital One's assertedly discriminatory conduct resulted in the Plaintiffs' termination from employment and consequent loss of salary and other benefits. *Id.* ¶ 158.

Count Two of the FAC alleges that Capital One's reorganization had a disparate impact on older employees, in violation of the ADEA. The Plaintiffs claim that the subjective evaluation standards that Capital One used, coupled with the targeted terminations of so-called substandard employees, disparately impacted employees over the age of forty. *Id.* ¶¶ 160–61. The result of Capital One's allegedly discriminatory conduct was that the Plaintiffs were deprived of their jobs, salaries, and employment-related benefits. *Id.* ¶ 163.

Count Three claims violations of the ADEA and OWBPA premised on the waiver of ADEA claims contained in the LOAs. The Plaintiffs claim that the waiver contains an unlawful tender back provision, which had a "chilling effect" on Plaintiffs' ability to file age discrimination claims against the Defendant on a timely basis. *Id.* ¶¶ 165–68. Moreover, Capital One allegedly implemented the waivers with the intent that this chilling effect occur. *Id.* ¶¶ 169–70. As remedy, the Plaintiffs seek (1) that the Plaintiffs be notified that the waivers are void; (2) that the Defendant be estopped from asserting a statute of limitations defense against the Plaintiffs; and (3) that the Plaintiffs who did not sign the waivers be provided with the monetary benefits withheld. *Id.* ¶¶ 171–73. The Plaintiffs also aver generally that the ADEA and OWBPA violation damaged them "in that they did not receive compensation and other benefits ... because Capital One conditioned receipt of such benefits on their signing the illegal Letters of Agreement." *Id.* ¶ 174.

In Count Four, the Plaintiffs allege that Capital One violated the OWBPA by implementing an " 'exit incentive or other termination plan affecting a group or class of individuals' " under the Act without providing the Plaintiffs with the information required under the Act in order for a lawful ADEA waiver to occur. *Id.* ¶ 177. Specifically, the Plaintiffs assert: (1) that Capital One was required by the OWBPA to, but did not, provide them with forty-five days within which to consider the waiver; and (2) the waiver was required to, but did not, include the ages and job titles of all persons "affected" by the termination program. *Id.* ¶¶ 177–78. The

result of the OWBPA violation is that "terminated Capital One employees who may hold valid legal claims against Capital One have been unlawfully deprived [of] access to the legal process, misled or delayed regarding their legal rights to file charges of discrimination against Capital One with the EEOC." *Id.* ¶ 179. In addition, employees who did not sign LOAs did not receive severance and other benefits tendered as consideration for the waiver of ADEA and other claims. The Plaintiffs seek the same relief under Count Four as is requested under Count Three. *Id.* ¶¶ 180–82.

Finally, Count Five presents a claim for unlawful retaliation under the ADEA, also arising out of the ADEA claim waivers in the LOA. Specifically, Count Five alleges that the "tender-back" provision was a threat to retaliate against the Plaintiffs if they engaged in the protected conduct of filing ADEA claims. *Id.* ¶¶ 183–85.

Capital One filed a Partial Motion to Dismiss and Motion to Limit Rearward Scope of Plaintiffs' Proposed Class Definition. First, the Motion to Dismiss asserts that the claims of Plaintiffs Gay, Jones, and Wilson should be dismissed with prejudice from this litigation because the statute of limitations has expired as to them. Second, the motion asserts that Plaintiff Krane's claims should be dismissed because he failed to timely file a consent to opt in to the class. Third, Capital One argues that Count Two, alleging disparate impact discrimination under the ADEA, should be dismissed for failure to state a claim. Fourth, Capital One asserts that Counts Three and Four should be dismissed for failure to state a claim because a violation of the OWBPA does not constitute an independent cause of action or ADEA violation. Finally, Capital One argues that Count Five should be dismissed for failure to state a claim because the Plaintiffs have not adequately alleged that

they participated in protected activity or that they faced retaliation as a result.

Capital One also argues that the proposed class, if any is certified, should be limited in temporal scope so as to exclude potential Plaintiffs who were terminated before October 11, 2002.

Each of these contentions will be discussed in turn.

## DISCUSSION

Under Fed. R. Civ. Proc. 12(b)(6), the defendant seeking dismissal of the complaint must establish that the plaintiff cannot prove any set of facts that will support his or her claim and entitle him or her to relief. In considering a motion under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences from those facts in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). In addition, it is appropriate to consider the documents attached to the complaint or referred to therein, and any relevant matters of public record. *See* 2 James Wm. Moore, et al., Moore's Federal Practice § 12.34[2] (3d ed.2002) (collecting cases and citing *Norfolk Southern Railway Company v. Shulimson Brothers Company, Inc.,* 1 F.Supp.2d 553, 555 n. 1 (W.D.N.C.1998)).

## I. Statute Of Limitations as to Gay, Jones, and Wilson

The ADEA provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." 29 U.S.C. § 626(d). "Such a charge shall be filed ... within 300 days after the alleged unlawful practice occurred." *Id. See also Tinsley v. First Union National Bank,* 155 F.3d 435, 440 (4th Cir.1998) ("The appropriate limitations period for filing a charge with the EEOC of an employment

practice proscribed by Virginia law … is 300 days."). The Plaintiffs' terminations are the discriminatory events complained of in the EEOC charges and in the FAC. The "limitations period for an ADEA action arising out of a job termination commences when the employee is informed of his termination, even if he is not aware of its discriminatory nature." *Olson v. Mobil Oil Corporation*, 904 F.2d 198, 200 (4th Cir.1990) (citation omitted). If a charge is not timely filed, the action must be dismissed[5] because dismissal "facilitates the prompt resolution of disputes upon fresh recollections" and "reflects the point at which Congress has determined the prospect of litigation should presumptively be laid to rest." *English v. Pabst Brewing Company*, 828 F.2d 1047, 1048–49 (4th Cir. 1987). It is undisputed that Gay, Jones, and Wilson initially filed their charges with the EEOC more than 300 days after their respective terminations from Capital One. Indeed, these facts are affirmatively pleaded in the FAC.

The Plaintiffs assert, in the FAC, that equitable tolling should apply to extend the statute of limitations on their ADEA claims until notice is given to Capital One's former employees that the ADEA waiver in their LOAs is unlawful.[6] As Capital One concedes, for the purposes of the Motion to Dismiss, the Court must assume that the LOA release was, in fact, invalid.

The Fourth Circuit has held that the statute of limitations under the ADEA "is

not jurisdictional, … and may equitably be tolled if a plaintiff proves 'that it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory.'" *Olson*, 904 F.2d at 200 (quoting in part *Miller v. International Telephone and Telegraph Corporation*, 755 F.2d 20, 24 (2d Cir.1985)). However, "[e]quitable tolling is a narrow limitations exception." *Id.* See also *Chao v. Virginia Department of Transportation*, 291 F.3d 276, 283 (4th Cir.2002) (" '[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes.' ") (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir.2000)). Whether equitable tolling is an appropriate remedy depends on the particular circumstances of each case. *See Harris*, 209 F.3d at 330 (" 'As a discretionary doctrine that turns on the facts and circumstances of a particular case, equitable tolling does not lend itself to bright-line rules.' ") (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir.1999)).

Particularly pertinent to the inquiry as presented in this action is that the Fourth Circuit has held that equitable tolling is permissible when the "employee's failure to timely file results from either a 'deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.' "[7] *Olson*, 904

---

5. *Cf. McCullough v. Branch Banking & Trust Company*, 35 F.3d 127, 132 (4th Cir.1994).

6. In the FAC, the Plaintiffs assert the doctrines of equitable tolling and equitable estoppel. However, in opposing the motion to dismiss, the Plaintiffs only argue the doctrine of equitable tolling. Hence, no further consideration need be given to the issue of equitable estoppel, a doctrine quite distinct from equitable tolling. *See Chao v. Virginia Department of Transportation*, 157 F.Supp.2d 681, 696–97

(E.D.Va.2001), *rev'd on other grounds*, 291 F.3d 276 (4th Cir.2002).

7. In addition, the statute of limitations may be tolled where the plaintiff files a defective pleading within the statute of limitations period or when " 'extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.' " *Chao*, 291 F.3d at 283 (quoting *Harris*, 209 F.3d at 330). The Plaintiffs do not allege that either of these situations obtains here.

F.2d at 201 (quoting in part *Price v. Litton Business Systems, Inc.*, 694 F.2d 963, 965 (4th Cir.1982)). *See also Chao,* 291 F.3d at 283 (stating that the statute of limitations may be tolled " 'where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.' ") (quoting *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). An employer may not claim the statute of limitations as a defense where it has acted to "conceal the existence of a cause of action." *English,* 828 F.2d at 1049. Nevertheless, even an employer's misbehavior does not excuse employees from the obligation to pursue their rights to the extent that doing so remains reasonably possible. *See Chao,* 291 F.3d at 283 ("Equitable tolling is not appropriate ... 'where the claimant failed to exercise due diligence in preserving his legal rights.' ") (quoting in part *Irwin,* 498 U.S. at 96, 111 S.Ct. 453); *Kokotis v. United States Postal Service,* 223 F.3d 275, 280 (4th Cir.2000).

Whether equitable tolling should apply is a case specific issue, and, therefore, it is helpful to examine the factual background of the controlling cases. In *Olson,* the plaintiff brought a claim of unlawful constructive discharge under the ADEA after the statute of limitations had expired on his claim. *Olson,* 904 F.2d at 200. The plaintiff was told before leaving the defendant's employ that his old job would be abolished and that several younger employees would share his former responsibilities. *Id.* It was only later, however, that the plaintiff received word that a younger man had been hired to take over his former job and title, which his employer had previously represented was to be eliminated altogether. *Id.* This information prompted the plaintiff to file a charge with the EEOC. *Id.* Notwithstanding that the employer allegedly had concealed its hiring plans from the plaintiff, the Fourth Circuit held that the doctrine of equitable

tolling did not apply because the plaintiff "was aware of virtually all of the evidence of discrimination upon which he now relies." *Id.* at 201.

In *Olson,* the plaintiff did not know the precise facts about his replacement, but he generally knew that his job duties were being taken over by younger, less qualified men and that he was being offered a choice of early retirement or demotion. *Id.* at 201–02. He also became suspicious in the final days of his employment that "age was a factor in the way he had been treated on the job." *Id.* at 202. The Fourth Circuit held that the information known to the plaintiff was sufficient to have supported the filing of a charge with the EEOC and that, in general, equitable tolling does not apply where the plaintiff "was on notice at the moment of his alleged ... termination 'to inquire whether there was [a] discriminatory motive for the discharge.' " *Id.* at 203 (quoting *Hamilton v. 1st Source Bank,* 895 F.2d 159, 164 (4th Cir.1990)). And, that is so even if the plaintiff did not have all of the facts necessary to prove that discrimination had, in fact, occurred. *Id.* at 202. Finally, the Court of Appeals rejected the argument that equitable tolling could be based solely on evidence that the employer's stated reason for termination was pretextual. *Id.* at 203 ("If equitable tolling applied every time an employer advanced a non-discriminatory reason for its employment decisions, it would be 'tantamount to asserting that an employer is equitably estopped whenever it does not disclose a violation of the statute.' ") (quoting in part *Blumberg v. HCA Management Co.,* 848 F.2d 642, 645 (5th Cir.1988)).

Another instructive case is *Price,* wherein the employee argued that the statute of limitations should be equitably tolled because the employer allegedly had induced him not to pursue his rights by providing

assistance in finding him a new job after his termination. *Price*, 694 F.2d at 965–66. The plaintiff did not deny that he knew that his discharge had been discriminatory at the time, that it happened. Instead, he asserted that he feared that his employer would stop providing him post-employment benefits if he filed a charge with the EEOC. *Id.* The Fourth Circuit Court of Appeals held that "[a]n employee's hope for rehire, transfer, promotion, or a continuing employment relationship . . . cannot toll the statute absent some employer conduct likely to mislead an employee into sleeping on his rights." *Id.*

The Fourth Circuit has not addressed the effect of an invalid OWBPA waiver on the applicability of equitable tolling. The First Circuit, however, addressed the issue in *American Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111 (1st Cir.1998). In *American Airlines*, the plaintiffs were participants in an early retirement program. As part of that program, the plaintiffs signed a form releasing all "age discrimination claims," along with other claims. *Id.* at 114. The release agreement admonished that the an employee would have to forfeit benefits under the agreement and pay the defendant's attorneys' fees if the release was breached. *Id.* The release substantially complied with the OWBPA "because there is no dispute that the employees were fully aware that only persons in their classifications who were over the age of 45 and at the highest pay rates were eligible, [and] that they were releasing age claims in exchange for enhanced benefits." *Id.* at 118. The agreement did not, however, advise employees to consult an attorney before signing it, as required under the OWBPA. *Id.* The First Circuit concluded that the release was defective because it did not comply with the OWBPA and that it could not be enforced against the plaintiffs to bar them from pursuing their ADEA claims. *Id.* at 116.

Notwithstanding the invalidity of the waiver, the court in *American Airlines*, held that the plaintiffs' claims were time-barred because the plaintiffs had not filed charges of discrimination with the EEOC within 300 days of their terminations. *Id.* at 123. In reaching that result, the First Circuit held that the statute of limitations was not equitably tolled because the plaintiffs knew about their statutory rights upon execution of the waiver. *Id.* at 124. The court explained that "[a]n employee has actual knowledge of his rights if he 'learns or is told of his ADEA rights, even if he becomes only generally aware of the fact there is a statute outlawing age discrimination.'" *Id.* (quoting in part *Kale v. Combined Insurance Company Of America*, 861 F.2d 746, 752 (1st Cir.1988)). The court then found that "[t]he release stated that the employees were releasing American from any age discrimination claims he or she [sic] may have had. Therefore, the employees had actual knowledge of their ADEA rights." *Id.*

In *Moss v. Detroit Edison Company*, 149 F.3d 1184, 1998 WL 322657 (6th Cir. 1998) (unpublished), the Sixth Circuit reached a similar conclusion. There, the plaintiff was terminated as part of a reorganization program, and he signed a waiver of claims as part of a Voluntary Severance Offer ("VSO"). *Id.*, 1998 WL 322657 at *2. The VSO stipulated that, by signing it, the plaintiff acknowledged that he had received a list of the ages and job titles of all employees eligible for termination as part of the reorganization plan. *Id.* Although the plaintiff claimed that he never, in fact, received this information, the court refused to apply equitable tolling to extend the statute of limitations on his claim. *Id.* at *4. The court stated that "even if we accept [the plaintiff's] characterization of the VSO as a misrepresentation on the part of [the defendant], courts refuse to apply equitable tolling where the employee

has failed to pursue his rights diligently." *Id.* The court found that the plaintiff's lack of effort in pursuing the information allegedly withheld from him and in discovering the reasons for his termination precluded application of the doctrine of equitable tolling. *Id.* at *5.

The decisions on which Capital One predicates its motion to dismiss Count One all were decided on summary judgment after full factual development in discovery of the factors respecting tolling. In deciding the applicability of tolling, it is appropriate to note that, for purposes of this motion, it must be presumed that the waivers are invalid for failure to identify the ages and job titles of other terminated employees. In other words, it must be assumed, as Capital One agrees, that the waivers at issue violate the OWBPA.

Moreover, it is necessary to keep in mind that, in enacting the OWBPA, Congress was concerned that age discrimination was difficult to detect and that older workers were being called upon to execute waivers when the basis for their claims would be indistinct. The Age Discrimination in Employment Waiver Protection Act of 1989, S.Rep. No. 101–79, at 9, 13 (1989). And, Congress was equally concerned about the fact that older workers were vulnerable to "extreme pressure to waive rights." *Id.* at 11.

Considering the expressed congressional concerns that were the reasons for enacting the waiver provisions and considering that those provisions (admittedly for purposes of this motion) were violated, and considering that equitable tolling is a quintessentially fact-based inquiry (especially where, as here, the Defendant is alleged to have concealed the existence of the claim), it is not appropriate to resolve the issue of equitable tolling as a matter of law. Rath-

er, it is preferable to allow development of the pertinent facts.[8] And, that is so even where, as here, there are lengthy delays between the terminations and the filing of the EEOC charges. Without doubt, the Plaintiffs' burden to establish tolling is a formidable one, but the question of whether they can meet it will be reserved for another day.

Thus, the motion to dismiss the claims of Plaintiffs Gay, Jones, and Wilson will be denied.

## II. Timeliness Of Krane's Consent

Class actions under the ADEA are governed generally by the provisions of the Fair Labor Standards Act ("FLSA"), rather than by Fed. R. Civ. Proc. 23. 29 U.S.C. § 626(b). The FLSA provides that

> [a]n action to recover the liability prescribed [under the ADEA] may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to [a class] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). Thus, a plaintiff must affirmatively opt in to an ADEA class action by filing a consent with the court. *See Cooke v. Reynolds Metals Company,* 65 F.R.D. 539, 540 (E.D.Va.1975). The ADEA also provides that a plaintiff has ninety days from the time he or she receives a right-to-sue letter from the EEOC to commence a civil action. 29 U.S.C. § 626(e). *See Baldwin County Welcome*

---

**8.** There is evidence that the Plaintiffs had some of the facts necessary to establish their ADEA claims before they filed the SAC, but it will be necessary to further develop the record as to what information the Plaintiffs had and when they had it.

*Center v. Brown,* 466 U.S. 147, 149–50, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984).

Plaintiff Krane did not file a consent to opt into the present litigation until well after the ninety day period had expired. However, on August 8, 2003, before that time had expired, Krane had filed his Complaint against Capital One purporting to represent a class of other former employees similarly situated. The Complaint satisfies the requisites for commencement of a civil action set out in the Federal Rules of Civil Procedure, which provide that "[a] civil action is commenced by filing a Complaint with the court." Fed. R. Civ. Proc. 3. Krane filed the FAC on November 21, 2003. The FAC relates back to the earlier-filed complaint under Fed. R. Civ. Proc. 15 because the original Complaint adequately put Capital One on notice of other "similarly situated" plaintiffs and the class-wide nature of Krane's claims. *See, e.g., Baldwin,* 466 U.S. at 150 n. 3, 104 S.Ct. 1723 (stating that, in order to relate back to an earlier complaint, an amended complaint must " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Anderson v. Montgomery Ward & Co., Inc.,* 852 F.2d 1008, 1018 (7th Cir.1988). In addition, the other named Plaintiffs had filed EEOC charges, so Capital One was aware of their ADEA claims at the time of the original Complaint. Krane did not file a consent to opt into the present litigation until December 3, 2003, after the ninety day period had expired.

The majority of Circuits to have addressed the issue are of the view that the named plaintiff need not file a consent to sue in order to commence a civil action within the statutory time period prescribed by the ADEA. Under that view, it is sufficient for the plaintiff to have filed the complaint that initiated the class action. *See, e.g., Grayson v. K Mart Corporation,* 79 F.3d 1086, 1105 (11th Cir.1996) ("It is undisputed that named plaintiffs commence their civil action upon the filing of their complaint."); *Sperling v. Hoffmann–La Roche, Inc.,* 24 F.3d 463, 468 n. 9 (3d Cir.1994); *Durant v. Maher Chevrolet, Inc.,* 759 F.Supp. 787, 790 (M.D.Fla.1991); *Michnuk v. G.O. Carlson, Inc.,* 1989 WL 143244, *7 (E.D.Pa.1989) (unpublished); *Anderson,* 852 F.2d at 1018–19; *O'Connell v. Champion International Corp.,* 812 F.2d 393, 394 (8th Cir.1987); *Allen v. Atlantic Richfield Co.,* 724 F.2d 1131, 1135 (5th Cir.1984); *Morelock v. NCR Corporation,* 586 F.2d 1096, 1103 (6th Cir.1978).[9]

The Fourth Circuit has not addressed this specific issue. However, in an action brought under another provision of the ADEA, the Fourth Circuit Court of Appeals held that commencement meant the filing of a complaint because "[w]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary." *Gilbarco,* 615 F.2d at 990 (quoting *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)) (internal quotation marks omitted). Moreover, the purpose of the consent requirement under the ADEA class action mechanism is to notify the defendant of every claimant in the litigation, and here Capital

---

**9.** *Cf. Equal Employment Opportunity Commission v. Gilbarco, Inc.,* 615 F.2d 985, 989 (4th Cir.1980) (stating that the "usual definition" of "commencement" found in Fed. R. Civ. Proc. 3 governs the initiation of litigation under another section of the ADEA); *Owens v. Bethlehem Mines Corporation,* 630 F.Supp. 309, 311 (S.D.W.Va.1986) (suggesting that the opt in consent of a named class plaintiff would relate back to the date of the filing of the complaint).

One was already on notice of the named Plaintiffs' claims. *See Anderson,* 852 F.2d at 1019 ("ADEA does not ... require that [the named] plaintiffs file a routine written consent whose only purpose is to notify the court and the defendants that the plaintiffs agree to participate in the lawsuit.").

Capital One relies on the decision *In re Food Lion,* 151 F.3d 1029, 1998 WL 322682 (4th Cir.1998) (unpublished) for the proposition that the named plaintiff in a litigation must affirmatively opt into the class action his complaint occasioned. *In re Food Lion,* however, addressed an FLSA class action and a statutory provision under the FLSA that has not been specifically incorporated into the ADEA. *Id.,* 1998 WL 322682 at *12. Thus, *In re Food Lion* is neither dispositive in this action nor contrary to the weight of authority under the ADEA that specifically holds that a named plaintiff need not opt into a class action under the ADEA.

For those reasons, the motion to dismiss Krane's claim as untimely is denied.

### III. Count Two: Disparate Impact Under The ADEA

The Defendant argues that Count Two of the FAC should be dismissed because, as a matter of law, there is no claim for disparate impact discrimination under the ADEA.

In 1993, the Supreme Court of the United States decided *Hazen Paper Company v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In that case, there was evidence that the employer had fired the plaintiff, not because of the plaintiff's age, but, instead, because his pension benefits (which were acquired on the basis of time in employment) were about to vest. *Id.* at 607, 113 S.Ct. 1701. The plaintiff's case was based on disparate treatment

theory, so the Court declined to decide whether or not a plaintiff could bring a disparate impact claim under the ADEA.[10] *Id.* at 609–10, 113 S.Ct. 1701 ("[W]e have never decided whether a disparate impact theory of liability is available under the ADEA ... and we need not do so here."). Nevertheless, the Court's process of reasoning spawned a spate of decisions respecting whether a disparate impact claim is available under the ADEA. The text of *Hazen* that is usually cited as persuasive is: "[d]isparate treatment ... captures the essence of what Congress sought to prohibit in the ADEA," *id.* at 610, 113 S.Ct. 1701, and the Court's observation that, in enacting the ADEA, Congress sought to prevent employers from using age-based stereotypes to evaluate employees; instead, "the ADEA commands that 'employers are to evaluate [older] employees ... on their merits and not their age.'" *Id.* at 611, 113 S.Ct. 1701 (quoting in part *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985)).

Many courts have addressed disparate impact claims under the ADEA in light of *Hazen* and have held that, as a consequence of the reasoning used to decide *Hazen,* disparate impact claims are no longer cognizable under the ADEA. *See, e.g., Smith v. City of Jackson, Mississippi,* 351 F.3d 183, 187 (5th Cir.2003), *cert. granted* —— U.S. ——, 124 S.Ct. 1724, 158 L.Ed.2d 398 (2004); *Adams v. Florida Power Corp.,* 255 F.3d 1322, 1326 (11th Cir.2001); *Mullin v. Raytheon Company,* 164 F.3d 696, 703–04 (1st Cir.1999); *Blackwell v. Cole Taylor Bank,* 152 F.3d 666, 672 (7th Cir.1998); *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1009 (10th Cir. 1996); *DiBiase v. SmithKline Beecham*

---

**10.** In a concurring opinion, Justices Kennedy, Rehnquist, and Thomas stated their conviction that disparate impact analysis was not available under the ADEA. *Hazen,* 507 U.S. at 618, 113 S.Ct. 1701 (Kennedy, J., Concurring).

*Corporation,* 48 F.3d 719, 734 (3d Cir. 1995); *Lyon v. Ohio Education Association and Professional Staff Union,* 53 F.3d 135, 140 n. 5 (6th Cir.1995); *Fobian v. Storage Technology Corporation,* 959 F.Supp. 742, 747 (E.D.Va.1997); *Green v. Storage Technology Corporation,* 1997 U.S. Dist. LEXIS 20564, *11–14 (E.D.Va. 1997) (unpublished). Notwithstanding *Hazen,* however, three Circuits have determined (one only in dictum) that disparate impact claims may be brought under the ADEA. *See District Council 37, American Federation of State, County & Municipal v. New York City Depts. of Parks and Recreation,* 113 F.3d 347, 351 (2d Cir. 1997); *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1469–70 (8th Cir.1996); *Mangold v. California Public Utilities Commission,* 67 F.3d 1470, 1474 (9th Cir. 1995) (dictum). *But see Allen v. Entergy Corporation, Inc.,* 193 F.3d 1010, 1015 n. 5 (8th Cir.1999) (stating that the issue of whether disparate impact claims are cognizable under the ADEA in the Eighth Circuit remained undecided and suggesting that *Smith* did not control the issue because it did not address the implications of *Hazen* ).

Recently, the Supreme Court granted a writ of certiorari in *Smith v. City of Jackson* to resolve the split in the Circuits on this issue. Under that circumstance and considering the current posture of this action, it is preferable to allow the disparate impact theory to proceed and to be resolved either by summary judgment or trial. Thereafter, if the Supreme Court concludes that a disparate impact claim does not exist under the ADEA, Count Two will be dismissed. However, if the Court finds that such a claim does exist, it will be unnecessary to reopen the proceedings. Hence, the motion to dismiss Count Two will be denied.

## IV. Counts Three And Four: Violation Of the OWBPA

█ In Count Three, the Plaintiffs allege that Capital One, as a part of the unlawful age discrimination plan which is the subject of Counts One and Two, secured waivers that violated the OWBPA. In Count Four, the Plaintiffs allege that Capital One implemented a termination plan but did not comply with the OWBPA provisions respecting such plans. According to the FAC, the waivers, including a so-called "tender-back" provision, were used to conceal a pattern of age discrimination. To redress the violations of the OWBPA alleged in Counts Three and Four, the Plaintiffs seek equitable relief and damages.[11]

Capital One has moved to dismiss Counts Three and Four because, in its view, "any alleged failure to meet the requirements of the OWBPA does not constitute a separate cause of action and is not a violation of the ADEA." Capital One's Opening Brief at 17. Capital One's argument is supported by a number of decisions, one from a court of appeals and others from various district courts.

The issue is a question of statutory construction and questions of statutory construction are to be resolved by first examining the text of the statute and considering the text at issue in the context of the statutory scheme of which it is a part. *Johnson v. MBNA America Bank, N.A.,* 357 F.3d 426, 431 (4th Cir. 2004). Of course, assessing the statutory

11. The equitable relief sought is notice to all discharged employees that the waivers are invalid and notice that those employees may have ADEA claims. The FAC also seeks an order invalidating the waivers and urges that Capital One be estopped from asserting any defense under the statute of limitations to ADEA claims. The damages sought are severance compensation and other benefits.

scheme in which the contested statute is situated includes an assessment of the articulated congressional purpose behind its implementation. *Id. See also National Coalition for Students with Disabilities Education and Legal Defense Fund v. Allen*, 152 F.3d 283, 292 (4th Cir.1998). If the text of the statute, given its usual meaning, considered in the context of the statutory scheme, does not resolve the dispute over the meaning of the statute, resort may be had to legislative history. *Universal Maritime Service Corporation v. Wright*, 155 F.3d 311, 320 (4th Cir. 1998). And, of course, decisions of any court interpreting the statute are useful guides to ascertaining the proper construction of the statute.

The text of the OWBPA does not explicitly state that there is a separate claim to remedy a violation of its proscriptive terms. Thus, it is appropriate to consider the statutory scheme of which the OWBPA is a part.

To begin, it is appropriate to recall that the OWBPA is an amendment to the ADEA, which Congress enacted in 1967. It did so based, *inter alia*, on a finding that "older workers find themselves disadvantaged in their efforts to retain employment" and that "the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons." 29 U.S.C. § 621(a)(1)-(2). Having made those findings, Congress declared that "[i]t is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; [and] to prohibit arbitrary age

discrimination in employment." 29 U.S.C. § 621(b). To those ends, Congress identified a number of unlawful employment practices. 29 U.S.C. § 623.

Congress then determined an enforcement mechanism, specifying that the ADEA "shall be enforced in accordance with the powers, remedies, and procedures provided in" the FLSA,[12] and in accord with the complimentary section for private enforcement specified under 29 U.S.C. § 626(c). 29 U.S.C. § 626(b). In establishing the general enforcement scheme for the ADEA, Congress explicitly provided that "[i]n any action brought to enforce this chapter the court shall have jurisdiction to grant *such* legal or *equitable relief* as may be *appropriate to effectuate the purposes of this chapter* . . . ." *Id.* (emphasis added). Then, in section 626(c)(1), Congress provided that "*[a]ny person aggrieved* may bring a civil action . . . *for such* legal or *equitable relief as will effectuate the purposes* of this chapter." 29 U.S.C. § 626(c)(1) (emphasis added).

In so providing, Congress conferred upon persons aggrieved by violations of the ADEA the right to bring a civil action to secure any legal or equitable relief that would effectuate the purposes of the ADEA. Those purposes include assuring the employment of older workers based on their ability, not their age, and prohibiting arbitrary age discrimination in employment. Congress underscored that rather broad enforcement charter by conferring upon courts of competent jurisdiction the power to grant legal or equitable relief "as may be appropriate to effectuate the purposes of this chapter."[13] 29 U.S.C. § 626(b).

**12.** In particular, as pertinent here, the enforcement provisions of 29 U.S.C. § 216 (except subsection (a)) and § 217.

**13.** To that end, Congress incorporated the damages and injunctive relief provisions of

the FLSA, 29 U.S.C. §§ 216, 217, and provided that prohibited conduct under the ADEA, 29 U.S.C. § 623, should also be deemed to be prohibited conduct under 29 U.S.C. § 215 of the FLSA.

In 1990, the ADEA was amended when Congress passed the OWBPA. "The policy of the OWBPA is ... clear from its title: It is designed to protect the rights and benefits of older workers." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998). The OWBPA amended the ADEA in two particulars. One change, which is not at issue here, had to do with employee benefit programs and decisional law respecting the ADEA in employment benefits. The other change was made to address the increasingly used, and, to Congress, the rather troubling, practice of securing waivers of ADEA claims from terminated employees. S.Rep. No. 101–263 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510.

The congressional purposes underlying the ADEA waiver provisions implemented as part of the OWBPA in 1990 were discussed and adopted in the Senate Report on the Age Discrimination in Employment Waiver Protection Act of 1989, S.Rep. No. 101–79, at 3–17 (1989). *Id.* at 1520. The legislative history discloses that Congress's impetus for the waiver provisions in the OWBPA was two-fold.

First, Congress was concerned that age discrimination was difficult to detect, particularly in the context of a large-scale termination program, and that employees might be induced to waive ADEA claims at a time when the basis for those claims would as yet be indistinct. S.Rep. No. 101–79, at 9, 13. Second, Congress was concerned with the particular vulnerability of older workers to being coerced into waiving their rights. That, according to Congress, was because older workers often have a more difficult time than younger employees finding employment after a ter-mination, and, therefore, they face "extreme pressure to waive rights," particularly when a waiver is accompanied by a generous severance package. *Id.* at 9–12. At base, Congress expressed that the purpose of the waiver provisions was to prevent employers from using waivers to coerce their employees into absolving them of often difficult to detect age discrimination.

The part of the OWBPA relating to waivers became 29 U.S.C. § 626(f) which specifies what is required, at a minimum, to make a waiver knowing and voluntary in private agreements.[14] Given that the "policy of the OWBPA" is "to protect the rights and benefits of older workers," *Oubre*, 522 U.S. at 427, 118 S.Ct. 838, considering the rather broad enforcement and civil action provisions specified by subsections 626(b) and (c); and considering that, in enacting the OWBPA, Congress articulated that "the bill ensures that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA," S.Rep. No. 101–263, *reprinted in* 1990 U.S.C.C.A.N. at 1510, it is difficult to discern a congressional intent to prohibit a person aggrieved by a violation of the waiver provisions from seeking such legal or equitable redress as would effectuate the statutory purposes by remedying a violation of the OWBPA. Nevertheless; one court of appeals and several district courts have concluded, at least as Capital One interprets those decisions, that there is available "no separate claim" to redress violations of the OWBPA's waiver provisions. An examination of Capital One's position and the decisions on which it relies is, therefore, necessary.

---

**14.** Subsection (f)(2) specifies that, at a minimum, it is necessary to make a waiver that is supervised by the EEOC a knowing and voluntary one. Subsection (f)(3) imposes on the party asserting the benefit of a waiver in a court proceeding the burden of pleading that the waiver was knowing and voluntary. Subsection (f)(4) provides that waivers do not affect the EEOC's rights and responsibilities to enforce the ADEA.

The starting point for Capital One's argument is its contention that "the Supreme Court has made clear that the sole, express statutory command of the OWBPA" is to regulate employee waivers of an ADEA claim. Capital One's Opening Brief at 18 (citing *Oubre*, 522 U.S. at 427, 118 S.Ct. 838). Capital One's argument reads a great deal into that sentence. Indeed, the argument places a much greater burden on that text than is appropriate because *Oubre* did not address whether there was a separate claim available for the redress of violations of the OWBPA. Hence, *Oubre* does not support Capital One's position on that issue.

Capital One's principal authority is *Whitehead v. Oklahoma Gas and Electric Company*, 187 F.3d 1184 (10th Cir.1999). However, *Whitehead* does not support Capital One's argument that there is no claim available under any circumstances for the redress of a violation of the waiver provisions. That is clear from the way that *Whitehead* framed the issue for decision. Specifically, after having noted that the parties were in agreement that the OWBPA's establishment of minimum waiver requirements can be "a shield for plaintiffs in an ADEA action when an employer invokes the waiver as an affirmative defense," the Tenth Circuit defined the issue under consideration as follows:

> [t]he issue we decide on appeal is whether the waiver provisions also are swords that provide plaintiffs with an independent cause of action for affirmative relief, *other than declaratory or injunctive relief to negate the validity of the waiver, as it applies to an ADEA claim.*

*Id.* at 1191 (emphasis added). In other words, the Tenth Circuit, in *Whitehead*, excluded from the reach of its decision an independent claim by an aggrieved party for declaratory or injunctive relief to negate the validity of a waiver that offended the OWBPA.

Nor is the fact pattern in *Whitehead* like the one presented here. Instead, the plaintiffs in *Whitehead* had asserted, as their principal claim, violations of the Employee Retirement Income Security Act ("ERISA")[15] to which they appended a claim for violation of the OWBPA. To remedy that violation, the plaintiffs "asked the court below to negate the signed waiver, to require [the defendant] to apply all years of service to the benefit calculations for the pension plan, and to award punitive damages." *Id.* at 1191.

In the context of that fact pattern and in perspective of the specifically defined issue, the Tenth Circuit: (a) concluded that "[t]he OWBPA does not by itself determine in the first instance whether age discrimination has occurred," *id.* at 1192; (b) found that the plaintiffs had not asserted a separate ADEA claim; and, (c) thereupon, sustained summary judgment on the claim that was based solely on the OWBPA. *Id.* ("Since Appellants have not asserted a separate ADEA claim, we conclude that the district court properly dismissed Appellants' claim that a violation of the OWBPA, by itself, establishes age discrimination."). Thus, contrary to the assertions of Capital One and contrary to statements in most of the district court opinions following *Whitehead*, the Tenth Circuit did not hold that an aggrieved party asserting that a waiver is invalid is, under all circumstances, foreclosed from making a claim based on the OWBPA for declaratory or injunctive relief.

The progenitor of the doctrine that an aggrieved party has no claim for redress for violation of the OWBPA's waiver provisions is *Equal Employment Opportunity Commission v. Sears, Roebuck and Com-*

---

**15.** The Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

*pany,* 883 F.Supp. 211 (N.D.Ill.1995). In *Sears,* the court held that, "to the extent the EEOC is attempting to create a cause of action based solely on an OWBPA violation, 29 U.S.C. § 626(f), the Court concludes that such a claim must be dismissed as a matter of law." *Id.* at 215. However, that conclusion was based upon the assertion that "[n]either section 626(f), nor any other section of the ADEA ... suggests that Congress intended to create a separate cause of action." *Id.* The citation for that conclusion is the text of section 626(f).[16]

The decision in *Sears* is correct in observing that section 626(f) does not specifically provide that a party aggrieved by a violation of the waiver provisions may seek redress for that violation in a court of competent jurisdiction. However, considering that the OWBPA was integrated into the ADEA which, in section 626(c), already provided that an aggrieved party may seek legal or equitable relief in a court of competent jurisdiction to "effectuate the purposes of this chapter," it is not surprising that Congress would have thought it unnecessary to insert that same language in subsection (f). The rather conclusory reasoning upon which *Sears* rests is not persuasive when its rationale is viewed in perspective of the text of the ADEA enforcement mechanisms, the place that section 626(f) occupies in the statutory scheme of which it is a part, and the congressional purposes which animate the ADEA and the OWBPA.[17]

Not long after *Sears* was decided, the United States District Court for the Eastern District of Michigan, in *Williams v. General Motors Corporation,* 901 F.Supp.

252 (E.D.Mich.1995), construed section 626(f) as not affording "a substantive cause of action under ADEA." *Id.* at 254. That finding also appears to be based upon the absence of an explicit statement in section 626(f) regarding the redress for violating its terms and concludes that, "[a]ssuming *arguendo* that OWBPA has been violated, the only conclusion that necessarily follows is that an employee who has suffered such a violation has not lost the right to press claims of age discrimination under ADEA." *Id.* at 255. A principal problem with that view is that it is fundamentally at odds with the articulated purpose of Congress in enacting the OWBPA, which was to ensure that older workers are not coerced and manipulated into waiving their rights to legal relief under the ADEA. And, of even more significance, that reasoning ignores the rest of the statutory scheme (the ADEA) into which the OWBPA was integrated.

Shortly after *Williams,* the United States District Court for the Western District of Michigan, in *Equal Employment Opportunity Commission v. Sara Lee Corporation,* 923 F.Supp. 994 (W.D.Mich. 1995), cited *Sears* for the proposition that "a failure to meet the requirements [of section 626(f) ] does not constitute a separate cause of action and is not a violation of the ADEA." *Id.* at 999. Consequently, the court rejected the efforts of the EEOC to seek an injunction against future use of noncomplying waivers. Like *Sears* and *Williams, Sara Lee* regards the OWBPA—section 626(f)—as if it were an independent statute, not a part of the ADEA. That does not square with the text of the

---

16. Also, the court in *Sears* held that "[t]he fact that Congress could have created a separate cause of action, but chose not to, precludes this Court from reading one into the statute now." *Id.*

17. It is interesting to note that, when afforded the opportunity to endorse the premises of *Sears,* the Tenth Circuit in *Whitehead* chose not to do so and, instead, adopted a considerably less restrictive analysis respecting the remedies available for violation of section 626(f).

statute or its legislative history. And, the result in *Sara Lee,* as was the case in *Sears* and *Williams,* frustrates the principal congressional purpose in passing the OWBPA.[18]

The Plaintiffs rely on *Commonwealth of Massachusetts v. Bull HN Information Systems, Inc.,* 16 F.Supp.2d 90 (D.Mass. 1998), in which the court, in a very thorough and well-reasoned opinion examining the entire line of authority on which Capital One relies, concluded that the "broad enforcement scheme articulated in subsection (c) of section 626 covers the waiver requirements articulated in subsection (f) of that section." *Id.* at 105. In *Bull,* as here, the plaintiff (there the Commonwealth of Massachusetts) alleged that the employer was using the waivers as part of a scheme to insulate itself from ADEA liability arising out of a discriminatory termination program. *Bull,* 16 F.Supp.2d at 94–95. And, in *Bull,* as here, the waiver contained a requirement that, if the employee exercised rights under the ADEA, the employee had to tender back the consideration for the release and settlement and was subject to suit by the employer. *Id.* at 95. In sum, the fact pattern in *Bull* was quite similar to the one alleged here.

The court, in *Bull,* compared the allegations of the complaint with the congressional purposes underlying the OWBPA and observed:

> Congress amended the ADEA out of concern that older workers are vulnerable to coercion or manipulation in waiving their rights to seek relief under the ADEA. Congress was particularly concerned that older workers might waive their rights when the release was related to large scale terminations in which most workers would not realize immediately that their age may have been a factor in termination decisions. Therefore, Congress sought to insure that older workers were fully appraised of their rights and had access to all relevant termination information before signing any waivers.

*Id.* at 106 (citations omitted).

Respecting the employer's interpretation of section 626, which is the same position taken here by Capital One, the court in *Bull* stated:

> Bull's crabbed reading of the enforcement provision of the statute *undermines these purposes,* particularly under the circumstances presented here. The critical issue of this case is that, if a former employee repudiates the waiver and brings an ADEA action against Bull, he or she is immediately subject to suit to return the severance benefits received and to indemnify Bull for the costs of defending the ADEA action . . . .
>
> Bull's interpretation of the enforcement provision thus presents a cynical Catch–22. According to Bull, the only way to test the validity of a waiver is when it is offered as a defense to an actual ADEA claim. However, given the terms of this waiver, very few former employees are going to risk the devastating penalties

---

**18.** The other decisions cited by Capital One are based on the same reasoning as are *Whitehead, Sears, Williams,* and *Sara Lee,* and there is no reason to repeat what already has been said on that score. See *e.g., Equal Employment Opportunity Commission v. UBS Brinson, Inc.,* 2003 WL 133235, 2003 U.S. Dist. LEXIS 570 (S.D.N.Y.2003) (unpublished); *Welch v. Maritrans, Inc.,* 2001 WL 73112 (W.D.Pa.2001) (unpublished); *Piascik–* *Lambeth v. Textron Automotive Co.,* 2000 WL 1875873 (D.N.H.2000) (unpublished). Capital One also cites *Kapossy v. McGraw–Hill, Inc.,* 921 F.Supp. 234 (D.N.J.1996), which is inapposite to the facts or the legal issues presented in this action, although it does contain some general language respecting what can and cannot be asserted as claims under the OWBPA.

involved in bringing their substantive claims.

*Id.* at 106 (emphasis added). Those comments in *Bull* echo the observations of the Supreme Court in *Oubre* that:

> [t]he rule proposed by the employer [that the employee had ratified the waiver by keeping the payments] would frustrate the statute's practical operation as well as its formal command. In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the moneys and relying on ratification. We ought not to open the door to an invasion of the statute by this device.

*Oubre*, 522 U.S. at 427, 118 S.Ct. 838.

For those reasons, the court in *Bull* permitted the plaintiff's claims for damages and equitable relief to go forward by denying the defendant's motion to dismiss under Fed. R. Civ. Proc. 12(b)(6). However, when the court subsequently considered the defendant's motion for summary judgment,[19] it concluded that, although the plaintiff's claims for declaratory and injunctive relief could go forward, the defendant was entitled to summary judgment on the plaintiff's damage claims.

In so doing, the court reaffirmed its conclusion that a violation of the OWBPA invalidates a waiver and that an employee might be entitled to a declaratory judgment or injunctive relief voiding the waiver, but, the court also explained that the same violation would not entitle the plaintiff to damages in the absence of substantive age discrimination. As explanation for this decision, the court pointed to Section 626(c) of the ADEA and then observed:

> the statute's purposes include "promot[ion of] employment of older persons based on their ability rather than age;" and elimination of "arbitrary age discrimination in employment." *A cause of action to enforce the OWBPA's provisions (for example, through a judgment declaring a waiver invalid) directly "effectuate[s]" these purposes by ensuring that older employees only waive their ADEA claims voluntarily and knowingly.* An action for *damages* based on OWBPA violations, however, is more complex. There is no measure of damages deriving from an invalid waiver that is separate and distinct from an employee's interest in escaping age discrimination.

*Bull*, 143 F.Supp.2d at 158 (citation omitted) (emphasis added). Thereupon, the court granted summary judgment in favor of the employer on the employee's freestanding damage claim under the OWBPA.

■ Taken together, the relevant authorities, viewed in perspective of the statutory text and the statutory scheme involved, lead to the conclusion that, under section 626(c), an employee can seek declaratory and injunctive relief for a violation of the OWBPA provisions respecting waivers found in section 626(f). However, a violation of section 626(f), standing alone, or without an accompanying ADEA age discrimination claim, is not viable because there is no monetary damage that can flow simply from a violation of the waiver provisions in section 626(f).

That approach to this issue effectuates the enforcement provisions of both the ADEA and the OWBPA, and the intent of Congress. Application of that approach

---

**19.** *Commonwealth of Massachusetts v. Bull HN Information Systems, Inc.,* 143 F.Supp.2d 134 (D.Mass.2001).

here necessitates the denial of Capital One's motion to dismiss Counts Three and Four for failure to state a claim upon which relief can be granted.[20]

## V. Count Five: Retaliation

 The ADEA states that "[i]t shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). To state a claim under 29 U.S.C. § 623(d), a plaintiff must allege that " '(1) [the] plaintiff engaged in protected activity, such as filing an EEO complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action.' " *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (quoting *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994)); *Munday v. Waste Management of North America, Incorporated*, 126 F.3d 239, 242 (4th Cir.1997).[21]

The protected activities in which the Plaintiffs are alleged to have participated are the filing of charges with the EEOC and the filing of the FAC. Without doubt, those activities often qualify as protected.

 The Plaintiffs approach the second element of the claim by arguing that a cognizable claim for retaliation may be maintained by a former employee even after his or her termination. *See Robinson v. Shell Oil Company*, 519 U.S. 337, 339, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177 (4th Cir.1998). And, that argument, as far as it goes, is correct. The Plaintiffs, however, then try to stretch that general principle into a cognizable retaliation claim by asserting that the following language in the LOA constitutes a threat of adverse employment action, thereby satisfying the second prong of their *prima facie* case:

> any action by you in violation of this Agreement shall void Capital One's obligations to you for all payments and benefits provided for under this agreement, shall require that you immediately forfeit all amounts paid to you by Capital One under this Agreement, and shall further require you to pay all reasonable costs and attorneys fees incurred by Capital One in defending any action brought by you in violation of this Agreement or brought by Capital One to enforce this Agreement, in addition to any other damages or relief to which Capital One may be entitled.

Capital One's Opening Brief, Ex. 6, LOA at 2–3. The Plaintiffs do not state that Capital One has actually taken any action to execute the "threat" in the LOA. Instead, they state generally that "[t]he issuance of the threatening language was a knowing and calculated attempt to interfere with protected ADEA rights." Plaintiffs' Memorandum in Opposition to Capital One's Partial Motion to Dismiss and Motion to Limit Class Definitions at 30. Moreover, the Plaintiffs point to the fact that Capital One contends that the LOA is valid when they press the related point that the "Defendant continues to assert the waivers and threatening language" against the Plaintiffs. *Id.*

---

**20.** Whether these counts will survive summary judgment is not an issue that is ripe for decision now.

**21.** Because the language of the retaliation provisions in Title VII and the ADEA are identical in material respects, Title VII precedent governs the burdens of proof under the ADEA. *See, e.g., Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir.1985); *Blistein v. St. John's College*, 860 F.Supp. 256, 268 n. 16, *aff'd* 74 F.3d 1459 (4th Cir.1996).

The issue thus presented is whether the language in the LOA, standing alone, constitutes an adverse employment action justifying liability under section 623(d) of the ADEA. In *Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir.2001), the Fourth Circuit stated that retaliation claims "require proof of an 'adverse employment action,'" *id.* at 863 n. 1, because "'there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause.'" *Id.* at 864 (quoting *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998)). Nevertheless, this substantiality did not require proof that the employer had made an "'ultimate employment decision'" with respect to the employee. *Id.* at 865. Rather, a showing of "any retaliatory act or harassment, if but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment" was necessary. *Id.* at 866 (quoting in part *Munday*, 126 F.3d at 243). *See also Thompson v. Potomac Electric Power Company*, 312 F.3d 645, 651–52 (4th Cir.2002). In addition, for former employees, "[o]utside the workplace, 'retaliatiory conduct may take the form of unfavorable references or even legal action.'" *Blistein*, 860 F.Supp. at 268 (quoting in part 3 Arthur Larson and Lex K. Larson, Employment Discrimination § 87.20, at 17–110 (1994)).

The Fourth Circuit has never decided whether an inchoate "threat" such as the one alleged in this case constitutes an adverse employment action under the retaliation provision of the ADEA. However, courts in other circuits have held that a threat does not constitute an adverse employment action under the ADEA. For example, in *Hollins v. Atlantic Company, Inc.*, 188 F.3d 652 (6th Cir.1999), the Sixth Circuit found that a threat to terminate the plaintiff was not an adverse employment action under the ADEA because it "merely stated the *possibility* of transfer or discharge." *Id.* at 662 (emphasis added). *See also Farra v. General Motors Corp.*, 163 F.Supp.2d 894, 911 (S.D.Ohio 2001). In *Helgeson v. American International Group, Inc.*, 44 F.Supp.2d 1091 (S.D.Cal.1999), the court found that "[a] mere threat of termination ... is not an adverse employment action" because it does not affect "the terms, privileges, conditions or duration of employment." *Id.* at 1098. *See also Heilman–Asmus v. Young*, 7 Fed.Appx. 694, 695 (9th Cir.2001) (unpublished). The Southern District of New York in *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359 (S.D.N.Y. 1999), applied the Fourth Circuit standard of adverse employment action to hold that a threat to withhold vacation days could not constitute an adverse employment action because the threat was unfulfilled and the plaintiff "did not suffer any consequences from that threat." *Id.* at 381 n. 13. *See also Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002). Similarly, in *Chisholm v. Foothill Capital Corporation*, 3 F.Supp.2d 925 (N.D.Ill. 1998), the court stated that "the mere threat of termination, standing alone, is only the threat of an adverse employment action, not an adverse employment action itself." *Id.* at 937–38. In addition, the Fifth Circuit has held that a threat of discharge is not an adverse employment action, after applying a different legal standard than is used by in Fourth Circuit. *See Mattern v. Eastman Kodak Company*, 104 F.3d 702, 707–08 (5th Cir.1997) (finding that a threat of discharge did not constitute an adverse employment action under the more stringent "ultimate employment decisions" test). *But see Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C.Cir.1988) (holding that repeated threats of retaliatory conduct that amount to harassment may be actionable as an adverse employment action).

*Bull* is the only decision holding that the text in an ADEA waiver agreement can constitute an adverse employment action. There, the court found that holding otherwise would mean that a plaintiff would "have to wait until an employer actually retaliates before invoking the protections of section 623(d)," even if the employer already had "a finger on the trigger of a gun pointed at each of the former employees who signed the waivers." *Bull,* 16 F.Supp.2d at 109. However, these statements were dicta because the plaintiff also had alleged that the employer had begun to act on the threats in the waivers. *Id.*

The tender-back provision is not actually a threat to take an adverse employment action. Rather, it is a contractual *in terrorem* clause under which the employee agrees to certain consequences if the employee asserts contractually waived rights through the engagement in what would be protected activities if taken in prosecution of those same rights, if they had not been waived.

This provision may be a contract of adhesion, and it may be unenforceable as a matter of public policy. It may even be, as the Plaintiffs here allege, a component of a scheme to protect against the discovery of age discrimination. But, whatever else the provision may be, it is neither an adverse employment action nor the threat of one. And, in any event, it cannot be said that the termination of the Plaintiffs' employment was caused by this clause.

For the foregoing reasons, Count Five fails to state a cognizable claim for retaliation under the ADEA. Hence, Capital One's motion to dismiss Count Five will be granted.

## VI. Motion To Limit Rearward Scope Of Plaintiffs' Proposed Class

Because the issue of class certification is not currently before the Court, the Defendant's Motion to Limit Rearward Scope of Plaintiffs' Proposed Class Definitions is not yet ripe and will be denied as premature.

## CONCLUSION

For the foregoing reasons, Capital One's Motion to Dismiss the First Amended Complaint is GRANTED in part and DENIED in part. Capital One's Motion to Limit Rearward Scope of Plaintiffs' Proposed Class Definitions is DENIED without prejudice as premature.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.