Dorothy L. WILLIAMS, Francine G. Thomas, Carrolle E. Henley, Oddie Hazen, Amy Pickett, Lillian Garner, Leona Palmer, Donald Mimmings, Mary Pogue, George Iskerko, Helen Hall, Fatry Allen, Shirley C. Thompson, Terrice Smith, Lorene Hill, Phyllis Watkins, Mary R. Phillips, Louise Johnson, Ira M. Ervin, Leontine Ferson, Gloria L. Alexander, Gracie J. Jackson, Jack Joiner, James Snow, Corine Rozier, Lucille Jenkins, Odessa Smith, Lorene Walker, Curtis L. Bailey, and Rosa L. Numm, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 94–73609.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 25, 1995.

Gary A. Benjamin, Detroit, MI, for plaintiffs.

Terence V. Page, Timothy K. McConaghy, Birmingham, MI, for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. BACKGROUND

Plaintiffs are former hourly employees of General Motors ("GM" or "the company") who had been working at the company plant on Fort Street in Detroit until it closed in 1988. At that time, they were placed in what is known as the Job Opportunity Bank Security Program ("JOBS Program") and not laid off. The JOBS Program was negotiated between GM and the United Auto Workers ("UAW" or "the union"), which represented the plaintiffs. Plaintiffs were required to report to a "JOBS bank" located at the Fort Street Plant. The JOBS bank employee group received full pay but were not required to do productive work; they watched television, read books, worked on crafts, took classes, and participated in volunteer projects.

As jobs at GM became available, employees in the JOBS bank would be called back to work; those with highest seniority would be called back first. An employee offered a full-time position within GM could either accept it or risk termination of employment[1]. Plaintiffs had to make such a choice after the JOBS bank moved from Fort Street to the Livonia Inland Fisher Guide Plant in April of 1992. Employees in the JOBS bank were to be transferred to the Saginaw Gear and Axle Plant in Detroit when jobs became available there. On November 16, 1992, the transfer became effective.

On November 12, 1992, all JOBS bank employees[2] were called to a meeting at which they were apprised of the transfer plan. UAW representatives were present at this meeting. GM representatives from the Saginaw Gear and Axle Plant were also present. The employees were informed that jobs were available for all of them. They were told that they could choose from among the following alternatives: acceptance of employment at the Saginaw Gear and Axle Plant[3]; normal retirement (available only to employees who were eligible); "document 117 retirement", which allowed employees to remain at home and collect 85 percent of normal wages until they were eligible for full retirement (available only to employees who were within two years of full retirement; plaintiffs who elected this option became eligible for full retirement in February of 1993); or placement on unpaid leave, without benefits, with the risk of job loss. Employees who opted for employment at the Saginaw Gear and Axle Plant were required to take physicals.

Plaintiffs' age and disability discrimination complaints under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq., Michigan's Elliott–Larsen Civil Rights Act, MCL § 37.2101 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq., are based on claims that GM played on the fears of plaintiffs by suggesting that the jobs which they were offered on a "take it or leave it or retire" basis would require heavy work that these employees, many of whom were over 55 and/or had medical restrictions, feared they could not perform. Claiming that they believed GM would fire them if they took the production jobs and proved unable to lift heavy items, causing them to lose both their jobs and retirement benefits, each plaintiff opted for the form of retirement for which he or she was eligible.

Plaintiffs support their claims that they were "coerced" into retirement through deposition testimony in which a company presentation they witnessed at the November 12 meeting is described. Betty Williams, Director of Hourly Employment at the Gear and Axle Plant at that time, conducted the presentation. In describing the type of work at the Saginaw facility, she projected pictures of heavy axles and parts. There is testimony that she told plaintiffs that they would be required to assemble a part that would weigh at least 200 pounds. Many plaintiffs were left with the impression that they would be required to do heavy lifting[4]. There is testimony that plaintiffs were told

---

**1.** This program was part of collective bargaining agreements between the union and General Motors in 1984, 1987 and 1990. Defendant has provided relevant excerpts at Exhibit D to its motion for summary judgment.

**2.** The term "JOBS bank employees" is used throughout this opinion to refer to the employees who reported to the Fort Street location when it was operative.

**3.** There is some evidence (affidavit of Dorothy Williams, Exhibit D to plaintiffs' response to defendant's motion for summary judgment) that one "younger" employee was allowed to work for General Motors as a financial secretary at a local union. However, by itself, this fact is not significant. There is no indication that any of the "older" employees were qualified for the position of financial secretary and that they should have been considered for that position.

**4.** Most of the testimony in this regard indicates that the plaintiffs believed they would have to do heavy lifting, but it is not clear what specifically they were told. Francine Thomas' deposition indicates that Williams said that an employee could expect to have to lift 30 pounds unassisted. What exactly was said with regard to how many people would be required to lift the fully assembled part is unclear; Thomas testified it was indicated that an employee might have to pick up the part, weighing over 200 pounds, with "someone else."

that their existing medical restrictions would not be accepted, that they would have to "rock and roll" on the job, and that any employee who did not think he or she could do the job should not take it.

GM essentially argues that plaintiffs misinterpreted the information they received at the November 12 meeting, and that in any event, all Fort Street JOBS bank employees, young and old, were treated similarly. Betty Williams stated in her affidavit that new physicals were necessary because the company could not accept medical restrictions based on physicals taken years earlier, and that the company made efforts to accommodate medical restrictions which resulted from the new physicals. Defendant points out that plaintiffs did not attempt to take physicals, did not report to the plant, or make any effort to determine if there were jobs for them within their possible restrictions.

Added to the claims of unlawful employment discrimination, plaintiffs in Count II of their complaint allege that the defendant violated the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 621, by rushing them into signing retirement agreements without allowing them to consider their decisions during the statutorily mandated time period and by not advising them to consult attorneys. Plaintiffs were given at most a day or so to decide and to inform management of their decisions. Each plaintiff accepted retirement within one day of the November 12 meeting. Plaintiffs argue that if they had been given 21 days to consider their decisions and 7 days to reconsider them, in accordance with their reading of OWBPA, they would have discovered that jobs existed at the Saginaw Plant which do not require heavy lifting, and they would have accepted such jobs. They seek recovery for economic and non-economic losses.

Nine employees signed releases of claims in connection with their retirements, and received a $10,000 voucher toward the purchase of a GM vehicle and an entitlement to a $3,000 cash payment. Twenty-one did not sign any release of any claims. Fourteen of the thirty never filed a charge of age discrimination with the Equal Employment Opportunity Commission/Michigan Department of Civil Rights ("EEOC/MDCR"). Twenty-seven never filed a charge of handicap discrimination with the EEOC/MDCR (the remaining three released their claims). On September 9, 1994, plaintiffs initiated this lawsuit.

## II. ANALYSIS

The parties argue over whether plaintiffs are procedurally barred from bringing these claims. I do not find it necessary to reach this issue since I am satisfied that plaintiffs have failed to establish a genuine issue of material fact under any of their claims. Pursuant to Fed.R.Civ.P. 56(c), summary judgment for the defendant on all counts must be granted.

■ Because a violation of OWBPA does not trigger a substantive cause of action under ADEA, summary judgment for defendant on Count II is warranted. The relevant portions of OWBPA provide:

(f) Waiver

(1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum-

.  .  .  .  .

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable

until the revocation period has expired; . . . .

29 U.S.C. § 626.

Putting aside the question whether defendant complied with the above provision, I do not accept plaintiffs' contention that a violation of the procedural requirements above may be extrapolated into a holding that a substantive cause of action for age discrimination exists. The statute means what it says, and it says, quite simply, that an employer must take certain steps when executing an agreement with an employee in which that employee relinquishes his or her right to press an age discrimination suit against the employer under ADEA. Assuming *arguendo* that OWBPA has been violated, the only conclusion that necessarily follows is that an employee who has suffered such a violation has not lost the right to press claims of age discrimination under ADEA. For purposes of simplifying the analysis only, I assume here that none of the employees effectively waived their right to an ADEA suit. Plaintiffs still bear the burden of proving that they suffered unlawful discrimination on the basis of age at the hands of GM.

Plaintiffs have not submitted evidence to sustain either a cause of action for age or disability discrimination. There has been no showing of disparate treatment; all of the Fort Street JOBS bank employees were invited to attend the November 12 meeting to hear the presentation made by Ms. Williams. All were advised of their options as JOBS bank participants under the collective bargaining agreement negotiated on their behalf by the UAW and GM. All had enjoyed the benefit of full pay without performing productive work after the Fort Street Plant closed.

GM was not obliged to continue this arrangement forever; the JOBS Program, as described in the Memoranda of Understanding in the collective bargaining agreement (*see* defendant's Exhibit C), provides GM with the option of placing JOBS bank employees on hiring lists for locations other than Fort Street. The agreement did not give the JOBS bank employees the right to pick and choose among jobs at GM, falling back on full pay for no work while available, albeit unattractive, jobs were offered to them.

Plaintiffs do not appear to be arguing to the contrary, for in their brief supporting their motion for summary judgment, they admit that GM could legally take the actions relating to the retirement offer if it had complied with OWBPA. But as stated, showing a violation of OWBPA does not suffice; without further evidence tending to show that GM acted with an intent to discriminate based on age or disability, plaintiffs cannot meet their burden of proof. Thus, summary judgment for defendants is appropriate on all counts.

For the above reasons, plaintiffs' motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.