Filed 8/25/15  Lui v. Leland Stanford Junior University CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PATRICK LUI et al., | H040866 |
| | (Santa Clara County |
| Plaintiffs and Appellants, | Super. Ct. No. 112CV232825) |
| | |
| v. | |
| | |
| LELAND STANFORD JUNIOR UNIVERSITY, | |
| | |
| Defendant and Respondent. | |

Plaintiffs Patrick Lui and James Simpson brought this action for age discrimination against their former employer, defendant Leland Stanford Junior University (Stanford).  The trial court granted Stanford's motion for summary judgment and entered judgment in its favor.  Plaintiffs appeal.  We affirm.

I.     **FACTUAL BACKGROUND**[1]

Prior to being laid off in 2011, plaintiffs were employed by Stanford at the Office of Technology Transfer at SLAC National Accelerator Laboratory ("SLAC").  SLAC is

_____

[1] We base our factual summary, in part, on the parties' separate statements of undisputed material facts.  The Code of Civil Procedure requires summary judgment opposition papers to "include a separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed," and to include "a reference to the supporting evidence" where a fact is disputed.  (Code Civ. Proc., § 437c, subd. (b)(3).)  Plaintiffs failed to comply with these statutory directives.  Their separate statement responded to only those material facts they disputed.  We shall consider undisputed the material facts to which they did not respond.  They also failed, in some instances, to reference any evidence in support of their contention that a particular fact is disputed.  We shall consider those facts to be undisputed as well.

operated by Stanford under a contract with the United States Department of Energy. The Department of Energy contract requires SLAC to carry out technology transfer, which refers to the transfer of technology from federal laboratories to the private sector. The Office of Technology Transfer's mission was to carry out that function by facilitating and promoting the use of SLAC's research and technologies by private industry, the scientific community, state and local governments, and the general public.

Simpson was hired to administer the newly established Office of Technology Transfer in 1990. His responsibilities included reviewing SLAC publications for patentable inventions; preparing formal patent disclosures; administering patent and copyright matters; identifying software created at SLAC with possible commercial implications; collaborating with individual researchers, institutions, and private businesses to identify opportunities to develop technology in partnership with the lab; negotiating and drafting agreements to facilitate these partnerships, known as Cooperative Research and Development Agreements ("CRADAs") and Work for Others agreements ("WFOs"); and administering the technology transfer program in accordance with Department of Energy regulations. Simpson has advanced math and science degrees but no law degree. Between 2005 and 2007 he inquired about getting funding from Stanford to obtain a law degree. He was informed by the human resources department that the degree was unnecessary and that there was no available funding. Simpson was born in 1948; he was 63 years old when he was laid off in December 2011.

Simpson hired Lui as a technology transfer associate in 1992. Lui's responsibilities included administering patent and copyright matters, reviewing technical work for transferable technologies, negotiating and administering technology and software agreements (e.g., CRADAS), and administering the technology transfer program in accordance with Department of Energy policy. With respect to technology and software agreements, Lui explained in his deposition that he worked with SLAC researchers who had invented patented technologies to identify private companies that

2

might want to license the technology. He then negotiated the licenses. Like Simpson, Lui has advanced science degrees but no law degree. Lui was born in 1945; he was 65 years old when he was laid off in December 2011.

In 1995, Simpson hired Fred Murphy, as a "casual" or part-time employee of the Office of Technology Transfer. Murphy does not have a law degree. Because he is a casual employee, Murphy's employment can be terminated at any time. He was not terminated in December 2011 when plaintiffs were laid off. Murphy was 75 years old in 2013.

Historically, SLAC was funded primarily by the Department of Energy's Office of Science. In 2010, at the direction of SLAC director, Persis Drell, SLAC management decided to pursue additional sources of funding for the lab. Part of the strategy was to bring in money through additional CRADAs and WFOs. According to SLAC's in-house legal counsel, Steven Porter, and Larry Dardzinski, who oversaw the Office of Technology Transfer, the general perception at SLAC was that the Office of Technology Transfer was slow in handling CRADAs and WFOs.

In view of the goal to increase funding, SLAC management reviewed a number of business units within SLAC, including the Office of Technology Transfer. The management team involved in the review included Porter, Dardzinski, and chief financial officer Linda Rakow, among others. Their review of the Office of Technology Transfer indicated the office processed only a few CRADAs and WFOs each year and produced almost no patent royalties for SLAC.

In September 2010, Dardzinski asked Simpson to put together a presentation for director Drell and other members of SLAC management addressing what the Office of Technology Transfer contributed to SLAC and how it supported Drell's vision for SLAC. Simpson presented two dry-runs of the presentation to management, not including Drell. Following the second dry-run, Dardzinski told Simpson by e-mail "[g]ood work" and that with "relatively minor improvements in format and we should be good to go" for the final

3

presentation to Drell. However, Porter, who attended the dry-runs, concluded the presentation did not show how the Office of Technology Transfer was going to meet the needs of SLAC in the future. Instead, he viewed the presentation as saying "if you want us to increase our volume, then you just gotta give us more people." Given the perceived "lack of ideas" in the presentation, Porter and others concluded it should not be given to Drell.

The director of technology, deployment and outreach at Pacific Northwest National Laboratory, Mike Schwenk, visited SLAC's Office of Technology Transfer at Porter's request in June 2011. As Schwenk understood it, his task was to examine three options concerning the future of technology transfer at SLAC: (1) maintaining the status quo, (2) eliminating the Office of Technology Transfer and shifting its work to Stanford, and (3) a hybrid approach with some technology transfer activities performed at SLAC and some at Stanford. Plaintiffs were informed in advance that Schwenk would be visiting to "do a review of the SLAC Tech Transfer functions." Simpson understood Schwenk's visit to be part of a larger "process of evaluating" where the Office of Technology Transfer "should be placed in the organization and how it should be structured." Schwenk met with plaintiffs and others at SLAC and Stanford. In a report issued following his visit, he concluded the Office of Technology Transfer did "not have the confidence of anyone [he] interviewed, at SLAC or on campus." Schwenk recommended the hybrid restructuring approach.

SLAC management concluded the Office of Technology Transfer needed a staff with strong business and legal acumen and that plaintiffs lacked those skills. In August 2011, management decided to restructure the Office of Technology Transfer by laying off plaintiffs, transferring some of their duties to other Stanford entities, and reassigning others to new and existing SLAC employees. Responsibility for publication review was reassigned to the department that generated the publication. The invention disclosure and reporting function was allocated to Stanford's Office of Technology Licensing. Joel

4

Pearman, an attorney and part-time employee with business training, took over CRADAs and WFOs with the assistance of Fred Murphy. Pearman was 64 years old in 2013. Jan Tulk, another attorney with business training, was hired as a contract and partnerships manager. She manages SLAC's Department of Energy contract, acts as part-time chief of staff for the lab director, and performs certain technology transfer duties previously done by plaintiffs. Tulk was 60 years old in 2013. Finally, Mark Hartney was hired to do marketing aimed at bringing in new funding. SLAC had not previously had a full-time marketing position. According to Porter, Hartney was hired because he "knows where the money is" as a result of his prior work at the Department of Energy, other government agencies tasked with funding research and technology, and the "White House Office of Science and Technology." His responsibilities include helping scientists find funding and applications for their research; SLAC touted him as an addition to its "Work for Others" team. Hartney was 52 years old in 2013.

In September 2011, plaintiffs were informed that their positions were being eliminated. They received written layoff notices in early December 2011. Those notices stated that plaintiffs' positions were being eliminated due to "restructuring and programmatic changes." Around the same time, employees of other SLAC departments undergoing reorganization also were laid off.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed suit on September 21, 2012, alleging causes of action for age discrimination and wrongful termination in violation of public policy. Stanford filed an answer and, later, moved for summary judgment or, in the alternative, summary adjudication. After briefing and a hearing on the motion, the trial court granted summary judgment in Stanford's favor. In its written order, the court concluded Stanford had demonstrated a legitimate business reason for laying off plaintiffs: in order for the Office of Technology Transfer to help achieve SLAC's goal of increased funding, its staff needed business and legal skills plaintiffs lacked. The court further concluded plaintiffs

5

failed to show Stanford's asserted reason for the layoffs was false or pretextual. Accordingly, the court ruled plaintiffs' age discrimination claim failed, as did its wrongful termination in violation of public policy, which was premised on the age discrimination claim.

The court entered judgment in Stanford's favor on March 17, 2014. Plaintiffs timely appealed.

## III.    DISCUSSION

### A.    *Legal Principles Governing Age Discrimination Claims and the Standard of Review*

"We review an order granting summary judgment de novo." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858 (*Serri*).) "In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing [his or] her evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Id.* at p. 859.)

California has adopted the so-called *McDonnell Douglas* test established by the United States Supreme Court for trying claims of discrimination, including age discrimination. (*Guz v. Bechtel National*, *Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) That three-stage burden-shifting test "allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Ibid*.)

In the context of a trial, the initial burden is on the plaintiff to establish a prima facie case of discrimination. (*Guz, supra*, 24 Cal.4th at p. 354.) While the elements of a prima facie case may vary depending upon the nature of the claim, the plaintiff typically is required to proffer evidence that "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory

motive." (*Id.* at p. 355.)  A legally mandatory but rebuttable presumption of discrimination arises if the plaintiff establishes a prima facie case.  (*Ibid.*)  Under the second step of the test, the burden shifts to the employer to rebut the presumption by " 'articulating a legitimate, nondiscriminatory reason for the challenged action.' " (*Serri*, *supra*, 226 Cal.App.4th at p. 861.)  "If the employer sustains this burden, the presumption of discrimination disappears." (*Guz*, *supra*, at p. 356.)  Under the third step of the test, the "plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Ibid.*)

In the summary judgment context, " 'the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Serri*, *supra*, 226 Cal.App.4th at p. 861.) "If the employer has met its burden by showing a legitimate reason for its conduct, the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.)  In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, " '[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)  Nor is it sufficient to show "that the company lied about its reasons" (*Guz*, *supra*, 24 Cal.4th at p. 360) because "[t]he pertinent statutes do not prohibit lying, they prohibit discrimination." (*Id.* at p. 361.)  While "[p]roof that the employer's proffered reasons are unworthy of credence

7

may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons[,] . . . there must be evidence supporting a rational inference that *intentional discrimination*, *on grounds prohibited by the statute*, *was the true cause* of the employer's actions." (*Ibid.*)

### B. *Stanford Carried its Burden to Show the Layoffs Were Based on Nondiscriminatory Factors*

Stanford maintains plaintiffs cannot establish a prima facie case of age discrimination because they were not replaced by significantly younger workers, nor were significantly younger, similarly situated workers treated more favorably. Alternatively, Stanford contends it showed plaintiffs' layoffs were motivated by legitimate, nondiscriminatory factors. We agree with the second contention and, therefore, need not consider the first.

Stanford submitted evidence showing that SLAC underwent reorganization in 2011 to increase lab funding. Stanford's evidence further showed that SLAC planned to raise funds, in part, by increasing the number of CRADAs and WFOs processed by the Office of Technology Transfer. Under plaintiffs' direction, the office processed few CRADAs and WFOs, and SLAC management concluded individuals with more business and legal expertise were needed to increase the office's productivity. Following plaintiffs' layoffs, their CRADA and WFO negotiation duties were assumed, in part, by two attorneys in their sixties with business training, one of whom was a part-time employee (Pearman) and one of whom shouldered other duties unrelated to technology transfer (Tulk). Plaintiffs' duties requiring technical expertise were reassigned to other Stanford entities. And the responsibility to identify new private sector partners (and funding sources) was assigned to a third new employee (Hartney) who was hired to focus exclusively on marketing.[2]

---

[2] Stanford contends Hartney is not involved in technology transfer. Given our obligation to view the evidence in a light favorable to plaintiffs and resolve any (continued)

In sum, Stanford showed that, after the reorganization, plaintiffs' varied duties were divided among different individuals with technical, legal, or business expertise, some of which plaintiffs were viewed as lacking. In doing so, it met its burden to produce evidence that its action was taken for legitimate, nondiscriminatory reasons.

### C. *Plaintiffs Did Not Carry Their Burden to Show Pretext*

In light of Stanford's evidence that it had nondiscriminatory reasons for laying off plaintiffs, the burden shifted to plaintiffs to offer evidence that the asserted reasons were a pretext for discrimination or evidence of discriminatory motive. Plaintiffs attempt to do so by showing Stanford's proffered nondiscriminatory reasons were false.

First, plaintiffs contend no "reorganization" of the Office of Technology Transfer occurred because its functions are mandated by the Department of Energy contract and those functions were reassigned to others. Regardless of what term is used, the evidence shows plaintiffs were not merely laid off and replaced with individuals who carried out their precise duties. Rather, their positions were eliminated. Their former technical duties were reassigned to scientists and engineers at Stanford; their former contract-related duties were reassigned to attorneys (Pearman and Tulk); and their former business development duties were reassigned to an attorney (Tulk) and a full-time marketing employee (Hartney). Plaintiffs point to no evidence showing the restructuring described did not occur.

Second, plaintiffs argue the supposed motivation for the reorganization--a new desire to generate funding from sources other than the Department of Energy--was false

---

evidentiary ambiguities in their favor, we must disagree. Simpson testified that part of his job was to connect private industry with SLAC engineers on projects. Similarly, Lui testified that his work involved identifying private companies that might want to license SLAC technology. The Federal Laboratory Consortium for Technology Transfer describes marketing of technology and finding partners as being a part of technology transfer. Hartney's job duties include marketing and networking with private sector partners, duties similar to those described by plaintiffs.

9

because SLAC had long sought to attract such funding. They do not dispute that director Drell in fact wanted to grow SLAC's funding base. And Simpson stated in his deposition that increasing non-Department of Energy funding was "a responsible course." Plaintiffs merely object to the characterization of the goal as "new." But, even assuming the reorganization was prompted by a renewed effort to achieve an existing goal, that does not suggest the reorganization was a pretext for age discrimination.

Third, plaintiffs say the new requirement that technology transfer employees hold a degree in law or business was added as a pretext for age discrimination. Plaintiffs note that neither Murphy nor Hartney holds such a degree. But that simply shows that no such degree requirement was imposed, nor does Stanford claim such a requirement exists. Instead, Stanford points to evidence that SLAC management concluded the Office of Technology Transfer required employees with "strong business and legal acumen." While Stanford repeatedly notes that plaintiffs lack degrees in law or business, it does so in the context of explaining why SLAC management concluded plaintiffs lacked the necessary legal and business skills.

With respect to the legal or business expertise requirement, the evidence shows Pearman and Tulk have law degrees and business training and Hartney has pertinent marketing experience. Plaintiffs contend they learned the necessary legal and business skills during their tenure at SLAC and were deprived of the opportunity to prove that when their presentation to Drell was cancelled. Of course, plaintiffs twice presented to other members of SLAC management who were involved in the layoff decision; plaintiffs failed to convince those individuals they had the requisite skills. In any event, even assuming plaintiffs had sufficient legal and business skills, that shows only that

Stanford's decision to lay them off was unwise, which is insufficient to create a triable issue of fact as to pretext.[3] (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

Plaintiffs contend the fact that their layoff notices did not cite lack of credentials shows the legal or business expertise justification is false. That argument overlooks the connection between the reason cited in the layoff notices--the restructuring--and the skills requirement. Undisputed evidence shows the reorganization resulted in the division of plaintiffs' duties among specialists. For those employees who took on the legal and business development aspects of plaintiffs' work, legal and business expertise, respectively, was required. Neither do the layoff notices prove the business or legal skills requirement was adopted after the fact, as plaintiffs argue. An August 2011 presentation prepared by Porter and Rakow regarding the reorganization expressly concluded that "tech transfer organization has a need for more business oriented staff, with limited technical/scientific support."

Next, plaintiffs argue Stanford's failure to provide them with information required by the Older Workers Benefits Protection Act (OWBPA) (29 U.S.C. § 626(f)(1)) at the time they were laid off raises an inference of discrimination. To waive a federal age discrimination claim under the Age Discrimination in Employment Act (ADEA) (29 U.S.C. § 621 et seq.), a release must meet the minimum requirements set forth in the OWBPA. Among other things, the OWBPA provides that "if a waiver is requested in

_____

[3] Plaintiffs criticize Stanford for laying them off given their extensive technology transfer experience and for hiring individuals they say had little such experience. But, again, showing Stanford's approach was imprudent is not enough. (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.) And, in our view, Stanford's decision to reallocate plaintiffs' duties to specialists in an effort to increase productivity is not implausible or otherwise unworthy of credence. (*Ibid*.)

In a related argument, plaintiffs say that if they lacked the necessary business and legal skills, they should have been fired for cause. But Stanford did not determine plaintiffs were incompetently performing the duties of their existing positions. Rather, it decided to eliminate those positions and to create more specialized ones, and that plaintiffs lacked the skills necessary for those new positions.

connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer . . . [must] inform[] the individual in writing . . . as to--[¶] **(i)** any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and [¶] **(ii)** the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." (29 U.S.C. § 626(f)(1)(H).) It is this information plaintiffs say they were not provided initially in a waiver Stanford requested they sign. (Plaintiffs do not cite to that waiver.) Stanford eventually provided them with a table purporting to list "the ages and job titles of the employees in the Operations Directorate who were and were not selected for layoff," but, aside from plaintiffs, those individuals were not considered for layoff in connection with the restructuring of the Office of Technology Transfer.

Plaintiffs neither signed a release nor assert a federal claim under the ADEA; their claims are premised on state law. Therefore, the OWBPA has no direct application to their case. (See *Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1368 ["The trial court properly concluded the [OWBPA was] inapplicable to plaintiff's release of his state law claims."].) Nevertheless, plaintiffs claim Stanford's failure to provide them with information about other employees who were and were not laid off raises an inference of age discrimination. We disagree. Federal courts have held that a plaintiff cannot meet his or her burden of proof under the ADEA merely by "showing a violation of OWBPA[,] . . . without further evidence tending to show that [the employer] acted with an intent to discriminate based on age." (*Williams v. General Motors Corp.* (E.D.Mich. 1995) 901 F.Supp. 252, 255 (*Williams*).) Put differently, "a violation of the OWBPA, by itself, [does not] establish[] age discrimination." (*Whitehead v. Oklahoma Gas & Elec. Co.* (10th Cir. 1999) 187 F.3d 1184, 1192.) "Assuming *arguendo* that OWBPA has been violated, the only conclusion that necessarily follows is that [plaintiffs

12

have] not lost the right to press claims of age discrimination under ADEA." (*Williams*, *supra*, at p. 255.)

Finally, plaintiffs claim Stanford breached its own personnel policies by laying them off instead of Murphy, a part-time employee who was hired after they were. The "Administration Guide Memo" on which they rely provides "temporary and trial-period employees will be terminated before regular staff employees are selected for layoff." Plaintiffs say they were "regular" employees while Murphy was not. But they cite to no evidence that a "casual," part-time employee (like Murphy) is considered a "temporary and trial-period" employee for purposes of the Administration Guide Memo. Common sense suggests a long-time casual employee is not the same as a "temporary" or "trial-period" employee. The Administration Guide Memo further provides that "[w]hen skills, abilities, performance, and competence of employees necessary to meet the current and prospective operations requirements are deemed by the management to be substantially equal, then length of continuous employment with the University . . . will be considered in selecting employees for layoff . . . ." While it is true that plaintiffs' continuous employment with the university exceeded Murphy's, Stanford presented evidence Murphy had skills plaintiffs lacked--namely, he is a registered patent agent. Moreover, even if Stanford's decision to layoff plaintiffs and retain Murphy violated its personnel policies, that violation does not support a rational inference of intentional age discrimination because Murphy is significantly older than plaintiffs.

In sum, we conclude plaintiffs failed to meet their burden of producing substantial evidence that Stanford's stated reasons for laying them off were untrue or pretextual, or that Stanford acted with a discriminatory animus, such that a reasonable trier of fact could conclude it engaged in intentional discrimination or other unlawful action. (*Serri*, *supra*, 226 Cal.App.4th at p. 868.)

## IV.  DISPOSITION

The judgment is affirmed. Stanford shall recover its costs on appeal.

13

_____
                              Walsh, J.[*]


WE CONCUR:



_____
      Rushing, P. J.




_____
      Elia, J.





Lui et al. v. Leland Stanford Junior University
H040866

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.